# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| NICHOLAS ABBOT, individually and on behalf of all others similarly situated, | ) | Case No. |
| | ) | |
| | ) | |
| Plaintiff, | ) | **CLASS ACTION COMPLAINT** |
| | ) | |
| v. | ) | JURY TRIAL DEMANDED |
| | ) | |
| BOOM SHAKALAKA, INC. d/b/a BOOM FANTASY, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

Plaintiff Nicholas Abbot ("Plaintiff"), individually and on behalf of all others similarly situated, hereby alleges the following against Defendant Boom Shakalaka, Inc. d/b/a/ Boom Fantasy ("Defendant" or "Boom Fantasy"), based upon, *inter alia*, the investigation made by his counsel, and based upon information and belief, except as to those allegations and experiences specifically pertaining to Plaintiff which are based upon his personal knowledge.

## NATURE OF THE CASE

1. This case arises out of Defendant's operation of an unlicensed sports betting platform masquerading as Daily Fantasy Sports ("DFS") contests.

2. Defendant owns and operates one of the most popular and profitable app-based fantasy-sports platform, Boom Fantasy, available at www.boomfantasy.com.

3. Boom Fantasy, for years, has falsely represented to consumers and the public that its contests are legal and legitimate "fantasy sports" in Illinois. In truth, Boom Fantasy's core offerings are single-player and against-the-house pick'em wagers that constitute unlicensed sports betting. By operating unlicensed sports betting, Defendant has violated Illinois laws, engaged in illegal deceptive active, and unjustly enriched itself to the tune of millions of dollars.

4. Daily fantasy sports platforms generally entice consumers to choose either player statistics or fantasy teams of real-world athletes and pit those teams against teams created by other participants. The outcome—who "wins" and who "loses"—is dictated not by skill, but by the

actual, real-world chance performance of the athletes on the fantasy teams.

5.    Boom Fantasy allows users to access "games" that are not "fantasy." Instead, these games are plainly illegal online sports bets predominately determined by chance. For example, Defendant's platform allows consumers to wager on how individual real-world athletes will perform against performance benchmarks unilaterally set by Defendant. Unlike peer-to-peer fantasy sports contests, Boom Fantasy offers single-player and against-the-house "pick'em" style contests that constitute illegal gambling and unlicensed sports wagering. In Defendant's app, consumers are not competing against one another, but in reality, they are betting against the house—Boom Fantasy—who sets sophisticated betting lines designed to ensure its own profit.

6.    These against-the-house wagers are not bona fide contests of skill. They are illegal gambling contracts, designed to ensure Boom Fantasy's profit at the expense of Illinois consumers.

7.    Indeed, in 2025 the Illinois Gaming Board and Attorney General issued cease-and-desist letters to other operators offering nearly identical single-player pick'em contests, declaring them unlawful gambling under Illinois law. Boom Fantasy has continued to flout Illinois law by offering these wagers to consumers.

8.    To deceive consumers, Boom Fantasy has branded itself as a "fantasy sports" platform, which is simply a title to mislead regulators and consumers into believing it offers lawful games of skill.

9.    Boom Fantasy players deposit money, stake entry fees, and win or lose depending entirely on the uncertain performance of third-party athletes in real-world professional and collegiate sporting events.

10.    Boom Fantasy profits by offering these unlawful contests to Illinois consumers. It collects entry fees, retains a guaranteed rake from every contest, and structures payouts so that the overwhelming majority of players lose money. By operating and profiting from illegal gambling, Boom Fantasy violates Illinois's Consumer Fraud Act and multiple state and federal gambling statutes.

11.    Boom Fantasy compounds the illegality by deceptively marketing its contests as "fantasy sports" and/or "games of skill," while concealing their true nature as proposition and

CLASS ACTION COMPLAINT

wagers. Reasonable consumers are misled into believing they are participating in lawful fantasy sports contests when in fact they are placing unlawful sports bets against the house.

12.     Online sports betting is highly addictive and strictly regulated in Illinois. The state's regulatory framework mandates that such games may only be offered by licensed operators. Defendant's operations flout these legal requirements by masquerading as an unlicensed "Daily Fantasy Sports" platform.

13.     Plaintiff, individually and on behalf of all other similarly situated, brings this action to stop Boom Fantasy from unlawfully operating sports-betting contests in Illinois, to secure restitution and damages for consumers who paid entry fees into these illegal games, and to obtain injunctive relief preventing Boom Fantasy from continuing to profit from unlawful gambling.

## PARTIES

14.     At all times material hereto, Plaintiff has been a resident of Cook County, Illinois.

15.     Defendant is a corporation organized and existing under the laws of Delaware, and with its principal places of business in New York. Defendant owns and operates an  illegal sports betting platform and app under the brand "Boom Fantasy." Boom Fantasy conducts business within the venue of this District and throughout Illinois generally.

## JURISDICTION AND VENUE

16.     This Court has jurisdiction over this action under the Class Action Fairness Act of 2005. Pursuant to 28 U.S.C. §1332(d), this Court has subject matter jurisdiction because (1) the amount in controversy, exclusive of costs and interest, exceeds the sum of $5,000,000.00, (2) the proposed Class is comprised of at least 100 members, and (3) complete diversity exists between at least one plaintiff or class member and one defendant.

17.     This Court has personal jurisdiction over Defendant because it regularly conducts business and activities in this District, including activities that form the basis for the claims here, and a substantial part of the acts and omissions complained of occurred in this District. Moreover, Plaintiff resides in this District.

18.     Venue is proper in this District under 28 U.S.C. §1391 because Plaintiff resides in this District, and a substantial part of the events or omissions giving rise to the claim occurred in

this District, including Boom Fantasy's unlawful actions.

19.     Moreover, Defendant actively disseminates targeted advertisements within the state with the intent of promoting and selling its products and services to consumers there. As such, Defendant does business with sufficient minimum contacts in Illinois.

20.     Defendant has purposefully directed its activities toward this District.

21.     Defendant has purposefully availed itself of the privileges of conducting activities in this District.

22.     Defendant's claim arises out and relates to Defendant's forum-related activities.

23.     The exercise of jurisdiction over Defendant is reasonable.

24.     Upon information and belief, Defendant localizes its game for each market where it is distributed, including the United States.

25.     Upon information and belief, Defendant has held, placed or deposited hundreds of thousands, if not millions, of dollars in wagers from Illinois residents, most of which are repeat transactions by the same customers, by contracting with the customers to take their bets and other goods in exchange for legal tender.

26.     Boom Fantasy facilitates ongoing economic activity between thousands of Illinois players and Defendant.

27.     Upon information and belief, Defendant directly controls whether consumers in Illinois can deposit money and wager with Boom Fantasy.

28.     Upon information and belief, Defendant has the capability to determine where its customers are from, including whether bets are being made from Illinois.

29.     Upon information and belief, Defendant has the capability to prevent Illinois residents from placing wagers in Boom Fantasy but has chosen to accept those wagers from Illinois residents. For example, other DFS applications prevent transactions from residents of states where DFS is unlawful.

30.     Upon information and belief, Defendant has taken no steps to restrict Illinois residents' access to Boom Fantasy or to restrict the ability of Illinois residents to make purchases

from Boom Fantasy.

31.     Upon information and belief, Defendant advertises Boom Fantasy in the United States, including in this District. Those advertisements include linear media, social media advertisements and/or advertisements in other mobile applications.

32.     Upon information and belief, these advertisements for Boom Fantasy were designed and directed to attract consumers in the United States, including this District, to play Boom Fantasy.

33.     Upon information and belief, Defendant has the capability of targeting its Boom Fantasy advertisements by geography and the capability of excluding residents of Illinois from the reach of Defendant's advertisements for Boom Fantasy.

34.     Upon information and belief, Defendant partners with certain companies to serve targeted online ads at users of other companies' websites, games and online services. Upon information and belief, these ads are targeted at players that Defendant identifies as potentially interested in Boom Fantasy, including residents of Illinois.

35.     Upon information and belief, Defendant utilizes unique device identifiers and Google Advertising ID and IP addresses in connection with these targeted ads. This information allows Defendant to identify the geographic location of its ad targets, including whether they are in Illinois.

36.     Upon information and belief, Defendant has taken no steps to restrict its advertisements for Boom Fantasy from reaching residents of Illinois.

37.     Plaintiff alleges, upon information and belief, that Defendant conducts professional and commercial activities in Illinois on a substantial, continuous, and systematic basis and therefore Defendant is subject to the general jurisdiction of the courts of this state.

38.     Plaintiff further alleges, upon information and belief, that the claims asserted in this complaint arise out of or are related to each of the Defendant's professional and commercial activities within Illinois, and therefore the Defendant is subject to the specific jurisdiction of the courts of this state.

CLASS ACTION COMPLAINT

**FACTUAL BACKGROUND AND COMMON ALLEGATIONS**

I. *The Problem of Online Sports Betting*

39.     Gambling addiction in the United States has escalated into a significant public health crisis, fueled by the rapid expansion of online casinos and sports betting platforms, including so called "Daily Fantasy Sports" platforms.

40.     Since the Supreme Court's 2018 decision to legalize sports betting, the number of states with legal sportsbooks has surged from 1 to 38, with total sports wagers increasing from $4.9 billion in 2017 to $121.1 billion in 2023.[1] This proliferation has been accompanied by a dramatic rise in gambling addiction cases.[2]

41.     Approximately 2.5 million adults in the U.S. suffer from severe gambling problems, while an additional five to eight million experiencing significant issues.[3] Alarmingly, individuals with gambling disorders are 15 times more likely to commit suicide than the general population.[4]

42.     Between 2018 and 2021, the Nation Council on Problem Gambling (NCPG) estimated that the risk of gambling addiction grew by 30%. NCPG has also seen significant increases in calls, texts and chats to the National Problem Gambling Helpline—roughly a 45% increase in calls between 2021 and 2022.[5]

43.     Further, internet searches for help with gambling addiction, such as "am I addicted to gambling", have cumulatively increased 23% nationally since *Murphy v. NCAA* through June

---

[1]  https://today.ucsd.edu/story/study-reveals-surge-in-gambling-addiction-following-legalization-of-sports-betting?utm_ (last accessed July 29, 2025).

[2] *See id.*

[3]  https://news.harvard.edu/gazette/story/2025/01/online-gambling-is-on-the-rise-panel-says-we-need-to-act-now/#:~:text=The%20National%20Council%20on%20Problem%20Gambling%20estimates%20that%20about%202.5,of%20callers%20is%20skewing%20younger. (last accessed July 29, 2025).

[4]https://www.who.int/news-room/fact-sheets/detail/gambling#:~:text=A%20Swedish%20study%20estimated%20that,the%20general%20population%20(4) (last accessed July 29, 2025).

[5]https://www.ncpgambling.org/news/ncpg-statement-on-the-betting-on-our-future-act/          (last accessed July 29, 2025).

2024. This corresponds with approximately 6.5 to 7.3 million searches for gambling addiction help-seeking nationally, with 180,000 monthly searches at its peak.[6]

44.     The surge in gambling addiction is particularly pronounced among young men, with 10% exhibiting behaviors indicative of gambling addiction, compared to 3% of the general population.[7] Online sports betting platforms have been identified as significant contributors to this trend. These platforms often employ addictive design features, such as count-down timers to pressure users into placing hasty bets.

45.     The addiction and fallout related thereto is not limited to gamblers. It has a ripple effect that negatively impacts spouses, partners, children, and employers. Moreover, despite the growing prevalence of gambling addiction, funding for treatment remains insufficient.

**II.**     ***Illinois Law and Regulatory Guidance.***

46.     Illinois has long prohibited unlicensed gambling as a matter of statute and deep-rooted public policy.

47.     Since before statehood, Illinois has strictly regulated and prohibited gambling activities that involve staking money on uncertain events. Under the Illinois Criminal Code, "[a] person commits gambling when he or she knowingly plays a game of chance or skill for money or other thing of value." 720 ILCS 5/28-1(a)(1). The statute makes it unlawful to "knowingly make a wager upon the result of any game, contest, or lot." *Id*. Illinois provides a narrow exception— not applicable here—for "a participant in any contest that offers prizes, award or compensation to the actual contestants in any bona fide contest for the determination of skill, speed, strength or endurance." 720 ILCS 5/28-1(b)(2).

48.     Consistent with this statutory prohibition, Illinois also authorizes civil recovery of gambling losses. The Illinois Loss Recovery Act ("LRA"), 720 ILCS 5/28-8, permits a person who

---

[6]  https://today.ucsd.edu/story/study-reveals-surge-in-gambling-addiction-following-legalization-of-sports-betting?utm_  (last accessed July 29, 2025).

[7] https://apnews.com/article/sports-betting-compulsive-gambling-addiction-d4d0b7a8465e5be0b451b115cab0fb15 (last accessed July 29, 2025).

loses more than $50 at gambling to sue the winner to recover those losses. If the "loser" does not bring suit, the LRA empowers any other person to sue the winner, and requires treble damages to be awarded. *Id*. § 28-8(b).

49.     In *Dew-Becker v. Wu*, 2020 IL 124472, the Illinois Supreme Court addressed for the first time whether daily fantasy sports contests constitute gambling under Illinois law. The Illinois Supreme Court adopted the "predominant factor test" and held that the particular contest at issue—a head-to-head, peer-to-peer DFS matchup—was predominantly skill-based, and thus fell within the statutory carveout for bona fide contests of skill. *Id*. ¶¶ 25-28.

50.     However, the Illinois Supreme Court emphasized the narrowness of its holding. It determined only that the specific *peer-to-peer* contest before it did not qualify as gambling, expressly noting that "[n]othing in this opinion should be read as stating that regulation of DFS contests is unnecessary or inappropriate. That determination is for the legislature." *Id*. ¶ 28.

51.     The Illinois Supreme Court did not extend immunity to all DFS formats (like Boom Fantasy's), nor did it bless contests where consumer play against the house instead of each other (like Boom Fantasy). On the contrary, the Court's reasoning makes clear that the skill-based exception depends on direct competition among contestants, where comparative skill determines the outcome.

52.     The Illinois legislature has since provided clear statutory definitions that capture the kind of contests offered by Boom. The Sports Wagering Act defines "sports wagering" to mean: "accepting wagers on sports events or portions of sports events, or on the individual performance statistics of athletes in a sports event or combination of sports events, by any system or method of wagering," such as Boom's mobile app-based platform, and includes "single-game bets, teaser bets, parlays, over-under, moneyline, pools, exchange wagering, in-game wagering, in-play bets, proposition bets, and straight bets." 230 ILCS 45/25-10.

53.     The Sports Wagering Act further provides that, unless licensed by the Illinois Gaming Board ("IGB"), no person or entity may engage in a sports wagering operation or activity in Illinois. 230 ILCS 45/25-20(a).

54.     In Illinois, numerous statutes make it unlawful to operate an internet site that

CLASS ACTION COMPLAINT

permits a person to make wagers on contests or events without an IGB-issued license. *See* 720 ILCS 5/28-1(a)(12); 230 ILCS 10/18(a)(1); 730 ILCS 5/5-4.5-55; 11 Ill. Adm. Code 1900.1210(a).

55.     Boom Fantasy is neither licensed nor authorized by the IGB to engage in sports wagering activity. Consequently, Boom Fantasy's activity constitutes illegal gambling in violation of Illinois law.

56.     Recently, Illinois regulators have scrutinized DFS operators offering "pick'em" contests and other against-the-house formats, like those offered by Boom Fantasy, that are materially different from the peer-to-peer contest considered by the Supreme Court.

57.     For example, in March 2025, the Illinois Gaming Board and the Illinois Attorney General issued cease-and-desist letters to operators such as PrizePicks, finding that "single-player pick'em" games—where the consumer selects overs/unders on athlete statistics set by the operator—constitute unlicensed gambling in Illinois. Those regulators expressly distinguished these formats from peer-to-peer fantast contests, recognizing that house-based pick'em games are functionally identical to proposition sports wagers.[8]

58.     As explained in further detail below, Boom Fantasy's pick'em games fall squarely within the conduct condemned by statute and Illinois regulators. Defendant sets its own statistical benchmarks and multipliers for athlete performance, and consumers wager against Boom itself. These house-based wagers are not bona fide contests of skill, but instead, are "proposition bets" and "over-under" bets as defined by 230 ILCS 45/25-10, and are illegal sports bets prohibited by Illinois law.

59.     Accordingly, Boom's unlicensed operation of single-player and house-based contests violates Illinois, subjects it to liability under the Loss Recovery Act, and renders its marketing of such contests as lawful "fantasy sports" based on "skill" false and deceptive under the Illinois Consumer Fraud Act.

---

[8] In response to this regulatory enforcement, PrizePicks announced that it would cease offering single-player contests in Illinois. See https://illinoisattorneygeneral.gov/news/story/attorney-general-raoul-urges-fans-placing-march-madness-wagers-to-exercise-caution-to-protect-information-funds?utm_source=chatgpt.com (last visited September 11, 2025).

CLASS ACTION COMPLAINT

### III.    *Numerous State Regulators Find DFS as Illegal Gambling*

60.    Numerous state regulators and attorneys general across the country have reached the same conclusion: paid daily fantasy sports contests constitute unlawful gambling or unlicensed sports wagering.

61.    For example, in 2016, the Alabama Attorney General reviewed the legality of DFS contests and issued cease-and-desist letters to DraftKings and FanDuel, determining that "paid daily fantasy sports contests constitute illegal gambling."[9] The Alabama Attorney General explained that while DFS contests involve some degree of skill, "the results … depend to a large degree on chance," and thus fall within Alabama's statutory definition of gambling.[10]

62.    More recently, other state regulators have issued similar determinations. In July 2025, the California Attorney General issued Opinion No. 23-1001, holding that daily fantasy sports contests—specifically, "pick'em" and "draft-style" contests—are unlawful sports wagering under California law. *See* Cal. Att'y Gen. Op. No. 23-1001 (July 3, 2025).

63.    State regulators in New York, Nevada, Texas, and other jurisdictions have likewise declared certain DFS formats, especially single-player or against-the house pick'em contests like Boom's, to be illegal gambling absent express legislative authorization.

64.    These consistent determinations by multiple state attorneys general and regulators confirm that DFS contests—particularly the single-player, house-based pick'em formats operated by Boom Fantasy—are widely recognized as unlawful sports wagering.

65.    Defendant was, or should have been, aware of this national regulatory consensus. Nevertheless, Boom continues to misrepresent its contests as lawful "fantasy sports" in Illinois despite clear notice that similar formats have been condemned as illegal gambling by regulators nationwide.

### IV.    *"Pick'Em" Contests Are Nothing More Than Proposition Bets*

---

[9]    https://www.alabamaag.gov/attorney-general-determines-paid-daily-fantasy-sports-contests-are-illegal-gambling/ (last visited September 3, 2025).

[10]    *Id.*

66.     In "pick'em" contests, players wager against the house on the performance of specific athletes on specified statistical metrics set by the operator itself. For example, a player may be asked to predict whether Steph Curry will score more than 20 points, or whether Jimmy Butler will collect more than 7 rebounds, in a given game.

67.     Pick'em contests violate Illinois' prohibition on gambling because entry fees are bilateral wagers between the consumer and the operator: the operator sets thresholds, the consumer pays money to predict whether the outcome will be above or below the line, and both sides have a direct financial stake in the outcome of the real-world sporting events.

68.     Pick'em contests are materially indistinguishable from proposition or parlay bets offered by traditional sportsbooks. Regulators in Virginia, Arizona, and Florida have explicitly categorized pick'em as "proposition betting," one of the most common and recognition forms of sports wagering.[11]

69.     Boom's pick'em contests differ materially from the peer-to-peer format address in *Dew-Becker*. Unlike peer-to-peer DFS contests, Boom's pick'em contests are player-versus-house wagers. Defendant, not another contestant, sets the statistical projections, multipliers, and payout structure.

70.     Players do not compete against each other using comparative skill. Instead, each player competes against Boom's preset lines, which mimic sportsbook "prop bets."

71.     Once a player makes a selection, he or she has no further ability to exercise skill. The outcome turns on the performance of athletes relative to Boom's line, a contingent event outside the participant's control.

72.     Under the predominant factor test adopted in *Dew-Becker*, chance predominates in Boom's house-based contests. Players cannot use skill to overcome the house's statistical line in the way a DFS roster competitor can outscore an opponent.

73.     Further confirming this distinction, in 2025 the Illinois Gaming Board and Illinois

---

[11] *See, e.g.*, 2023 Ops.Va.Atty.Gen. 133 (Dec. 12, 2023); Wyoming Gaming Commission, letter to PrizePicks, July 5, 2023; Florida Gaming Control Commission, letter to Betr, Sept. 19, 2023.

Attorney General issued cease-and-desist letters to other operators offering nearly indetical "single-player pick'em" formats, declaring such contests unlawful gambling in Illinois.

74.     Boom's games thus fall outside the purview of *Dew-Becker*. They are not "bona fide contests of skill" but unlicensed wagers against the house, prohibited by Illinois gambling law.

## V.     *Daily Fantasy Sports Are Merely a Digital Reincarnation of Illegal Sports Betting*

75.     The mechanics of DFS mirror those of traditional sports wagering that Illinois law strictly regulates. Like traditional sportsbooks, DFS operators induce consumers to stake money on the uncertain performance of real-world athletes in real-world sporting events.

76.     DFS "pick'em" contests replicate typical proposition bets, requiring consumers to predict whether individual athletes will exceed or fall below a statistical line set by the operator. This is no different from a traditional over/under sportsbook bet on whether a player will score a certain number of points or rebounds in a given game.

77.     Similarly, Boom also offers a game called "Pick & Spin," where participants select over/under bets on player statistics from different teams. After making their selections, participants are prompted to spin a digital wheel that randomly determines the payout multiplier—purportedly offering a chance to win up to 500 times their original wager. The outcome of the spin has nothing to do with any skill exercised by the participant' it is dictated entirely by chance. Even if a limited degree of skill is involved, the payout structure—and thus the amount the participant may win or lose—is determined by the spin of a wheel, a quintessential game of chance. This randomization injects pure chance into the contest, ensuring that the operator, not the participant's skill, controls the expected value of the wager.

78.     In both formats, players pay entry fees that constitute wagers because they are promises to give money depending on the outcome of uncertain future sporting events. Just as in traditional sports betting, players do not control or influence the athletic contests; they merely bet on them.

79.     Thus, DFS contests, like Boom Fantasy's, constitute nothing more than unlawful sports betting disguised as fantasy games. Indeed, it is simply the latest iteration of sports betting— delivered and gamified through addictive mobile apps instead of racetracks or betting parlors—

CLASS ACTION COMPLAINT

that Illinois law has long regulated to shield consumers from the well-documented, historical dangers of gambling.

**VI.** ***Boom Fantasy Uses "Daily Fantasy Sports" Contests to Disguise Illegal Sports Betting.***

80. Defendant Boom Fantasy operates a website and mobile application available in Illinois that offers consumers the ability to deposit real money, enter paid contests, and win cash prizes based on the real-world performance of professional athletes. Throughout its website and mobile application, Boom Fantasy lures consumers into playing to win "real money."

81. Boom Fantasy advertises itself as a "fantasy sports" platform to avoid gambling regulations and trick potential players into believing that it offers legal contests. But this is false. In reality, Boom Fantasy's contests are structured as sports wagers prohibited by Illinois law. Players risk money on uncertain athletic outcomes, and Boom Fantasy, as the operator, profits by retaining a portion of the entry fees paid by consumers.

82. Players can access Boom Fantasy either through the internet on Apple and Android devices in the United States through the App Store and Play Store, respectively.

### a. *Boom Fantasy's "Pick'em" Contests*

83. In Boom Fantasy's "Pick'em" contests, users are prompted to select between two and eight professional athletes across upcoming games. For each athlete, Boom Fantasy sets a statistical threshold — for example, whether Steph Curry will score "over or under 28.5 points" or whether Patrick Mahomes will record "over or under 85.5 rushing yards."

84. After making their selections, users place an entry fee of their choosing. The amount wagered dictates the size of the potential payout, which increases with the number of predictions bundled together. For example, a $20 entry predicting two outcomes may return $60 if both are correct, while a five-pick entry may pay out 20 times the entry fee if every prediction hits.

85. The structure of these contests mirrors proposition betting offered by traditional sportsbooks. Players are not competing against one another in a game of skill. Instead, they are betting directly against Boom Fantasy (the house), who sets the "lines" for each athlete's statistical performance.

86.     The operator has a direct financial interest in the outcome: if a consumer's predictions are wrong, Boom Fantasy retains the entry fee; if correct, Boom Fantasy pays out winnings based on a pre-set schedule it controls.

87.     These mechanics are indistinguishable from traditional sports wagers in that the results of the Pick'em contests are contingent and unknown at the time the bets and wagers are collected and recorded by Boom Fantasy.

### b.   Boom Fantasy's "Squad Ride" Contests

88.     Boom Fantasy offers another version of a "pick'em" contest called "Squad Ride" in which players pay an entry fee to assemble a roster of three athletes drawn from at least two different teams. The roster's combined statistical performance is then measured against three preset scoring "milestones." Each milestone is associated with a payout multiplier applied to the entry fee:

      a.   Milestone 1: 2x payout

      b.   Milestone 2: 5x payout

      c.   Milestone 3: 20x payout

89.     The point thresholds for these milestones are not fixed but are adjusted based on the athletes selected. For example, a roster of LeBron James, Kevin Durant, and Steph Curry may trigger multipliers at 80, 90, and 100 points, whereas substituting Nikola Jokic may elevate the thresholds to 85, 92, and 108 points.

90.     Critically, players are paid only for the single highest milestone achieved. The awards are not cumulative. Thus, if a roster achieves the second milestone, the player receives only 5x their stake, not both the 2x and 5x payouts. Meeting or tying a milestone is treated as achieving it. If a player selection is canceled, the entry fee is refunded.

91.     These "Squad Ride" contests are not harmless fantasy contests. Players are not competing in sporting events themselves but are wagering money on the performance of athletes over whom they have no control. As described above, regulators and courts have consistently recognized such contests as indistinguishable from parlay or horse-race betting.

92.     "Squad Ride's" structure is not meaningfully distinguishable from traditional sports

wagering regulated in Illinois: players risk money on uncertain future sporting events, with outcomes outside of their control, and receive payouts in escalating multiples of their stake depending on the real-world performance of chosen athletes.

### c. *Boom Fantasy Profits from Illegal Sports Betting*

93. Through its Pick'em contests, Boom Fantasy's business model depends on consumers staking real money on the uncertain outcomes of professional sporting events.

94. Boom Fantasy profits by setting statistical thresholds, structuring payouts to favor the house, and retaining a percentage of entry fees. The overwhelming majority of participants lose money, while Boom Fantasy reaps substantial revenue from illegal sports wagering.

95. By disguising sports betting as "fantasy sports," Boom Fantasy misleads consumers into believing they are participating in lawful contests. In truth, Boom Fantasy's mobile app offers nothing more than illegal sports betting in violation of Illinois law.

## VII. *Boom Fantasy Deceptively Markets Illegal Sports Betting as "Fantasy Sports"*

96. Boom Fantasy markets its website and mobile app to consumers as a "fantasy sports" platform, creating the false impression that its contests are lawful, skill-based games rather than prohibited sports wagering.

97. On its website and within the app store descriptions, Boom Fantasy repeatedly refers to its contests as "fantasy," "games of skill," and "entertainment," despite the fact that participants stake real money on the uncertain, short-term statistical performance of professional athletes in real-world sporting events.

98. Boom Fantasy's "Pick'em" contests are marketed as causal fantasy games where consumers "choose higher or lower" on player statistics, but the operator fails to disclose that those mechanics are identical to parlay or proposition betting lines offered by traditional sportsbooks.

99. A reasonable consumer, seeing Boom Fantasy marketed as a fantasy sports app in the Apple App Store or Google Play Store, would be misled into believing the contests offered are lawful and materially different from traditional sports betting.

100. In truth, Boom Fantasy's contests are unlicensed sports wagers prohibited by Illinois law. By misrepresenting and concealing the true nature of its contests, Boom Fantasy

CLASS ACTION COMPLAINT

engages in fraudulent and deceptive conduct that violates the Illinois Consumer Fraud Act.

**VIII.** ***All Purported Contracts With Defendant Are Void***

101.    There are two separate and independent reasons why any purported contract with Defendant is void.

102.    First**,** under Illinois law, all contracts based wholly or partly on money or value obtained through illegal gambling is void. § 720 ILCS 5/28-7.

103.    Thus, no contract was ever formed between the parties, and any purported contract between himself and Defendant, and any contractually based defenses Defendant may raise are likewise void.

104.    And the entire contract is void, because "all promises, contracts or agreements entered into, where the whole or any part of the consideration shall be for any money, property or other valuable thing won by any gaming, shall be void and of no effect*." Riordon v. McCabe*, 341 Ill. 506, 509, 173 N.E. 660, 662 (1930).

105.    Even if not void, they are unconscionable as the terms and conditions is an adhesion contract.

106.    Parties cannot contractually agree to engage in conduct that is criminal or otherwise contrary to public policy. Just as a person cannot lawfully contract to engage in forced labor, sex trafficking, illicit drug sales, or other illegal conduct, neither can they enter into a valid and enforceable agreement to participate in unlawful gambling. Any purported contractual relationship between Plaintiff and Defendant—premised on participation in illegal gambling activity—is therefore void ab initio.

107.    Accordingly, Plaintiff hereby voids any purported agreement or contract between himself and Defendant. As a result, Defendant may not invoke any contractual defenses—including arbitration clauses, choice-of-law provisions, or class action waivers—because no valid or enforceable agreement exists.

## FACTS SPECIFIC TO PLAINTIFF

***Plaintiff Abbot's Experience***

108.    In response to advertisements seen on social media, Plaintiff created an account

with Boom Fantasy on or 2023. Plaintiff played Boom Fantasy from approximately 2023 to February 2025 during which he participated in Pick'em contests and other against-the-house bets.

109. Boom Fantasy represented to Plaintiff that the products and services it offered in Illinois were legal. Boom Fantasy never disclosed that its "Fantasy Sports" games were in actuality illegal sports wagers.

110. In downloading the app and signing up for an account, Plaintiff expressly relied on Boom Fantasy's representations that the services were legal in Illinois.

111. Plaintiff accessed Boom Fantasy and placed all of his wagers in Boom Fantasy in Illinois.

112. Plaintiff placed numerous bets on Pick'em through Boom Fantasy's app. Overall, Plaintiff wagered and lost thousands of dollars.

113. Boom Fantasy never informed Plaintiff of the true nature of its DFS contests were actually illegal sports bets. Had Boom Fantasy honestly and accurately disclosed the unlawful nature of its online platform, Plaintiff would have never signed up for Boom Fantasy or paid Boom Fantasy any money.

114. As a result of Defendant's unfair, unlawful, and deceptive acts, Plaintiff suffered damages and Defendant was unjustly enriched.

115. Plaintiff enjoys playing legal DFS and has an ongoing interest in playing Boom Fantasy if it were to change to be devoid of unlawful, deceptive and unfair business practices. Plaintiff therefore has an ongoing interest in Boom Fantasy complying with state and federal gambling laws and consumer protection statutes.

## CLASS ALLEGATIONS

116. Plaintiff brings this case as a class action pursuant to Fed. R. Civ. P. 23(a) and 23(b) on behalf of himself and all others similarly situated defined as follows:

117. The Class is defined as follows:

Illinois Class: All persons in Illinois who, during the applicable limitations period, played and lost money wagering on Defendant's online Daily Fantasy Sports platform.

Illinois Loss Recovery Subclass: All persons in Illinois who have lost at least $50

in money wagering on Defendant's online Daily Fantasy Sports platform.

118.    Collectively, the "Illinois Class" and "Illinois Loss Recovery Subclass" shall be referred to as the "Classes." Excluded from the Classes are: (1) any Judge or Magistrate residing over this action and members of their families; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which the Defendant or their parents have a controlling interest and its current or former employees, officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Classes; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendant's counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

119.    **Numerosity.** Upon information and belief, there are hundreds, if not thousands, of Class members, so joinder of all members is impracticable. The precise number of class members and their identifies are unknown to Plaintiff currently but may be ascertained from Defendant's books and records and other third-party sources.

120.    **Commonality.** There are many questions of law and fact common to the claims of Plaintiff and the other members of the Class, and those questions predominate over any questions that may affect individual members of the Class. These common legal and factual questions, each of which may also be certified under Rule 23(c)(4), include the following:

    a.  Whether the DFS contests in Boom Fantasy are illegal gambling as defined under Illinois law;

    b.  Whether Defendant engaged in the conduct alleged in the Complaint;

    c.  Whether Defendant violates the statutes listed below in Counts I and II;

    d.  Whether Defendant violated statutes analogous to those alleged herein applicable;

    e.  Whether and how Defendant manipulates the odds in games offered in Boom Fantasy;

    f.  Whether Plaintiff and the other Class members were damaged by Defendant's conduct; and

g.  Whether Plaintiff and the other Class members are entitled to  restitution or other relief.

121.    **Typicality**. Plaintiff's claims are typical of the claims of the Class because they were players of Boom Fantasy who made in-game purchases of coins and wagered such coins as a result of Defendant's unlawful and wrongful conduct. The factual and legal basis of Defendant's liability to Plaintiff and to the other Class members are the same, resulting in injury to the Plaintiff and to all of the other members of the Class. Plaintiff and the other members of the Class have suffered harm and damages due to Defendant's unlawful and wrongful conduct.

122.    **Adequacy.** Plaintiff will fairly and adequately represent and protect the interests of the other members of the Class. Plaintiff has retained counsel with substantial experience in prosecuting complex litigation and class actions. Plaintiff and his counsel are committed to vigorously prosecuting this action on behalf of the other Class members and have the financial resources to do so. Neither Plaintiff nor his counsel have any interest adverse to those of the other members of the Class.

123.    **Predominance & Superiority.** Absent a class action, most Class members would find the cost of litigating their claims to be prohibitive and would have no effective remedy. The class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation in that it conserves the resources of the courts and the litigants, and promotes consistency and efficiency of adjudication. The damages or other financial detriment suffered by Plaintiff and

putative class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, so it would be impracticable for members of the proposed Class to individually seek redress for Defendant's wrongful conduct.

124.    **Final Declaratory or Injunctive Relief.** Defendant has acted and failed to act on grounds generally applicable to the Plaintiff and the Class members, requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class members, and making injunctive or corresponding declaratory relief appropriate for the Class as a whole.

## FIRST CAUSE OF ACTION
### Violation of the Illinois Loss Recovery Act
### 720 ILCS 5/28-8
### (*On Behalf of Plaintiff and the Illinois Loss Recovery Subclass*)

125.    Plaintiff repeats, realleges, and incorporates the allegations in Paragraphs 1–124 by reference as if fully set forth herein.

126.    Plaintiff brings this count individually and on behalf of the Illinois Loss Recovery Subclass.

127.    720 ILCS 5/28-8(a) provides that:

> Any person who by gambling shall lose to any other person, any sum of money or thing of value, amounting to the sum of $50 or more and shall pay or deliver the same or any part thereof, may sue for and recover the money or other thing of value, so lost and paid or delivered, in a civil action against the winner thereof, with costs, in the circuit court.

128.    The Illinois Supreme Court has found that the "purpose of section 28-8(a) is not simply to undo illegal gambling transactions but 'to deter illegal gambling by using its recovery provisions as a powerful enforcement mechanism.'" *Dew-Becker*, 178 N.E.3d at 1037-38 (quoting *Vinson v. Casino Queen, Inc.*, 123 F.3d 655, 657 (7th Cir. 1997)).

129.    Plaintiff, Illinois Loss Recovery Subclass members, and Defendant are "persons" under 720 ILCS 5/28-8(a). *See* 720 ILCS 5/2-15 ("Person" means "an individual, natural person, public or private corporation . . . partnership, unincorporated association, or other entity.").

130.    The activity of "gambling" includes anyone who, *inter alia*, "knowingly establishes, maintains, or operates an Internet site that permits a person to play a game of chance or skill for money or other thing of value by means of the Internet," 720 ILCS 5/28-1(a)(12), "knowingly plays a game of chance or skill for money or other thing of value," 720 ILCS 5/28-1(a)(1), or "knowingly . . . uses . . . any gambling device." 720 ILCS 5/28-1(a)(3).

131.    The Illinois Loss Recovery Act defines a "gambling device" as a "slot machine or

other machines or device for the reception of money or other thing of value" that on "chance or skill . . . is staked, hazarded, bet, won, or lost." 720 ILCS 5/28-2(a).

132. Defendant's DFS platform is a mobile app that permits consumers to play games of chance for money or other things of value.

133. As described herein, Boom Fantasy operates unlicensed and illegal gambling contests in Illinois, including single-player "Pick'Em," "Pick & Spin," and other against-the-house formats. Defendant's DFS contests do not permit players to compete against other players. Rather, players compete against the "house," and Defendant is the "winner" under the statute because it has a direct stake in the result of the gambling.

134. Plaintiff and Class members lost money to Boom Fantasy by paying entry fees and losing wagers in these unlawful gambling contests.

135. Plaintiff and the members of the Illinois Loss Recovery Subclass have each lost more than $50 gambling on Defendant's platform.

136. Defendant owns, operates, and controls the gambling games described herein, and directly profited from Plaintiff's and the Illinois Loss Recovery Subclass members' gambling losses. Defendant is therefore the "winner" under 720 ILCS 5/28-8(a) of all moneys lost by Plaintiff and the Illinois Loss Recovery Subclass members.

137. Boom Fantasy operates an unlicensed and illegal DFS platform that is accessible in Illinois.

138. Plaintiff's and the Illinois Loss Recovery Subclass members' losses occurred in Illinois because Defendant's online DFS contests were played by Illinois residents on mobile devices in the State of Illinois. Defendant had actual knowledge that Plaintiff and the Illinois Loss Recovery Subclass members reside in Illinois because each of them selected "Illinois" as their

CLASS ACTION COMPLAINT

state of residence and provided their complete home address pursuant to Defendant's mandatory registration process.

139.     Plaintiff, on behalf of himself and the Illinois Loss Recovery Subclass members, seek an order requiring Defendant to (1) cease the operation of its gambling devices, and (2) return all lost monies, with costs, pursuant to 720 ILCS 5/28-8(a).

**SECOND CAUSE OF ACTION**
**Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act**
**815 ILCS §§ 505/1, *et seq.***
**(On behalf of Plaintiff and the Illinois Class)**

140.     Plaintiff repeats, realleges, and incorporates the allegations in Paragraphs 1–124 by reference as if fully set forth herein.

141.     The Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 ILCS §§ 505/1, *et seq.*, bars any unlawful, unfair, or deceptive conduct in trade or commerce. This includes acts such as misrepresentation, false advertising, fraud, false promises or pretenses, and the concealment or omission of material facts.

142.     The ICFA applies to Defendant's actions and conduct as described herein because it protects consumers in transactions that are intended to result, or which have resulted, in the sale of goods or services.

143.     Defendant is a "person" as defined by 815 ILCS 505/1(c).

144.     Plaintiff and the Illinois Class are "consumers" under 815 ILCS 505/1(e).

145.     Boom Fantasy's practices described above, including the operation of an illegal sports betting platform, were unlawful, unfair, and deceptive within the meaning of the ICFA because they constitute unlawful and unregulated gambling.

146.     Defendant's practices described above, including their operation of illegal sports betting platform were unfair within the meaning of the ICFA because they offended Illinois' public

policy against unlawful and unregulated gambling. *See, e.g.*, 720 ILCS 5/28-7 (Gambling contracts void); *Hall v. Montaleone*, 348 N.E.2d 196, 198 (Ill. App. Ct. 1976) (stating that "gambling contracts or contracts for an immoral or criminal purpose" are "absolutely void and unenforceable" by reason of "public policy"), and were otherwise unethical, oppressive, and unscrupulous and caused substantial injury to the consumers who wagered on Boom Fantasy's platform.

147.     Boom Fantasy also violated the ICFA by misrepresenting its single player and against-the-house contests as lawful "fantasy sports" or "games of skill," when in reality they are unlicensed sports wagers and proposition bets prohibited by Illinois law.

148.     These misrepresentations and omissions were material to a reasonable consumer deciding whether to participate in Boom's contests.

149.     Defendant caused substantial injury to Plaintiff and the Illinois Class by inducing them to place wagers through its illegal gambling platform. The injury caused by Defendant's conduct is not outweighed by any countervailing benefits to consumers or competition, and the injury is one that consumers themselves could not reasonably have avoided.

150.     Defendant's unfair practices occurred during the marketing and sale of Sweeps Coins for use on Wow Vegas' illegal gambling platform, and thus, occurred in the course of trade and commerce.

151.     Further, Defendant represents to consumers, including Plaintiff, that its games are not gambling and you can "play for free." Plaintiff relied on these representations in playing Wow Vegas.

152.     Further, Defendant conceals from consumers, including Plaintiff and the Illinois Class, that wagering with Sweeps Coins on its platform constitutes illegal gambling prohibited by state law.

153.     Defendant aggressively markets and advertises its platform through various media while at the same time concealing that it is illegal under state law. As such, Illinois consumers,

including Plaintiff and the Illinois Class, are highly likely to continue to encounter current and future iterations of Defendant's illegal platform absent injunctive relief.

154.    Not only is Defendant's conduct unfair, but as discussed above, Defendant's conduct is also unlawful given that they knowingly maintain and operate "an Internet site that permits a person to play a game of chance or skill for money or other thing of value by means of the Internet," 720 ILCS 5/28-1(a)(12), and otherwise knowingly play games of chance for money or other things of value, 720 ILCS 5/28-1(a)(1), and knowingly use gambling devices, 720 ILCS. 5/28-1(a)(3).

155.    Further, Defendant's conduct is immoral because it is designed to encourage illegal gambling while marketing its platform as a legal simulation of casino-style games, as well as to exploit psychological triggers associated with gambling and addiction in order to target susceptible populations.

156.    As a direct and proximate result of Defendant's conduct and violations of the ICFA, Plaintiff and the Illinois Class members have suffered harm in the form of monies paid and lost for Defendant's Sweeps Coins.

157.    Plaintiff, on behalf of herself and the Illinois Class members, seeks an order requiring Defendant to (1) cease the unfair practices described herein, (2) return all monies acquired through any purchase that included the transfer of Sweeps Coins to Plaintiff and the Illinois Class, and otherwise (3) pay damages, interest, and reasonable attorneys' fees, together with costs and expenses.

### THIRD CAUSE OF ACTION
### Unjust Enrichment
### (On behalf of Plaintiff and the Illinois Class)

158.    Plaintiff repeats, realleges, and incorporates the allegations in Paragraphs 1–124 by reference as if fully set forth herein.

159.     Defendant has been unjustly enriched through its operation of unlawful gambling contests in Illinois.

160.     Plaintiff and the Illinois Class members have conferred a benefit upon Defendant by paying entry fees and losing money on Defendant's illegal gambling platform.

161.     Defendant appreciates and has knowledge of the benefits conferred upon it by Plaintiff and the Illinois Class, even though its contests were illegal under Illinois law.

162.     Under principles of equity and good conscience, Defendant should not be permitted to retain the money obtained from Plaintiff and the Illinois Class members, which Defendant has unjustly obtained as a result of its unlawful operation of DFS contests. As it stands, Defendant has retained millions of dollars in profits generated from its unlawful gambling contests and should not be permitted to retain those ill-gotten profits.

163.     Accordingly, Plaintiff and the Illinois Class members seek full disgorgement of all money Defendant has retained as a result of the wrongful conduct alleged herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests, individually and on behalf of all others similarly situated, the following relief:

1.  For an order certifying this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, defining the Class as requested herein, appointing Plaintiff as class representative and his counsel as class counsel;

2.  Awarding Plaintiff all economic, monetary, actual, consequential, compensatory, and punitive damages available at law and to be determined by proof;

3.  Awarding Plaintiff and the class members appropriate relief, including actual and statutory damages;

4.  Awarding Plaintiff's reasonable attorneys' fees, costs, and other litigation expenses;

5.  Awarding pre- and post-judgment interest, as allowable by law;

6.  For an order enjoining Defendant from continuing to engage in the wrongful acts and practices alleged herein;

7.  Declaratory and equitable relief, including restitution and disgorgement;

CLASS ACTION COMPLAINT

8.  For public injunctive relief as the Court may deem proper; and

9.  Awarding such further and other relief as the Court deems just, proper and equitable.

## JURY DEMAND

Plaintiff requests trial by jury of all claims that can be so tried.

Dated: October 1, 2025

Respectfully submitted,

By: */s/ Scott Edelsberg*

**EDELSBERG LAW, P.A.**
Scott Edelsberg, Esq.
Gabriel Mandler
1925 Century Park E #1700
Los Angeles, CA 90067
Telephone: 305-975-3320
scott@edelsberglaw.com
gabriel@edelsberlaw.com

**SHAMIS & GENTILE, P.A.**
Andrew J. Shamis
Edwin E. Elliott
14 NE 1st Ave., Suite 705
Miami, FL 33132
Telephone: 305-479-2299
ashamis@shamisgentile.com
edwine@shamisgentile.com

*Counsel for Plaintiff and the Proposed Class*

CLASS ACTION COMPLAINT